UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | |
|---|---|
| STEPHEN A. MARINO, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| vs. | ) Case No. 4:05CV02036 AGF |
| | ) |
| JO ANNE B. BARNHART, | ) |
| Commissioner of Social Security, | ) |
| | ) |
| Defendant. | ) |

**MEMORANDUM AND ORDER**

This action is before the Court[1] for judicial review of the final decision of the Commissioner of Social Security, reopening and reversing a prior decision that Plaintiff Stephen Marino was eligible for disability insurance benefits under Title II of the Social Security Act, 42 U.S.C. §§ 401-434, and supplemental security income under Title XVI of the Act, 42. U.S.C. §§ 1381-1384f. For the reasons set forth below, the Court will reverse the decision in part and remand the case for further proceedings.

Plaintiff, who was born on November 27, 1955, applied for benefits on December 8, 1999, alleging a disability onset date of February 28, 1999, due to major depression, anxiety disorders, and personality disorders. Tr. at 171. Following a hearing on May 30, 2000, an Administrative Law Judge ("ALJ") found on August 29, 2000, that Plaintiff was disabled since his alleged onset date. Tr. at 34-36. The record suggests that Plaintiff

---

[1] The parties have consented to the exercise of authority by the undersigned United States Magistrate Judge under 28 U.S.C. § 636(c).

previously had received disability insurance benefits from September 1991 until December 1993, at which point his benefits ceased due to his working. Tr. at 197.

On October 24, 2004, Plaintiff's case was reopened following a criminal investigation into Plaintiff's sale of prescription drugs. A second hearing was held before the same ALJ on January 11, 2005. On January 28, 2005, the ALJ found that Plaintiff had engaged in substantial gainful activity ("SGA") since his alleged disability onset date. The ALJ reversed the previous decision that Plaintiff was entitled to benefits and denied his December 8, 1999 application for benefits. The Appeals Council of the Social Security Administration declined to review the ALJ's decision. Plaintiff has thus exhausted all administrative remedies and the ALJ's January 28, 2005 decision stands as the final agency action.

Plaintiff argues that the ALJ erred in finding that Plaintiff was not disabled. Specifically, Plaintiff argues that the ALJ erred because Plaintiff has disabling impairments and is unable to work; Plaintiff was denied his right to be represented by counsel at the January 11, 2005 hearing and did not receive a full and fair hearing; Plaintiff has not engaged in SGA, and alternatively, there was no evidence that Plaintiff engaged in SGA before August 2004.

## BACKGROUND

### Work History

Plaintiff self-reported his work history when he applied for benefits in 1999. He wrote that he had been employed as the site manager of a multi-family apartment unit

2

from August 1988 to December 1991, earning from $24,000 to $30,000 per year; and from January 1994 to February 1998, earning from $36,000 to $40,000 per year. Tr. at 156-57. He reported that he ceased working there in 1998 because he was terminated. Tr. at 166. Plaintiff also wrote that from August 1998 to February 1999, he was employed full-time as a site manager with Greystone Partners, earning $40,000 per year. Id. Plaintiff wrote that he was terminated from this job because he had arguments with the management, had trouble concentrating, and was found sleeping on the job. Tr. at 171.

**Criminal Investigation**

On October 12, 2004, the Cooperative Disability Investigations Unit ("CDIU") for the Social Security Administration issued a Report of Investigation regarding Plaintiff. The author of the report, a CDIU detective, stated that on September 3, 2004, a St. Louis County Police narcotics detective contacted the CDIU about the ongoing investigation of the illegal sales of prescription drugs by Plaintiff and his wife. The police detective reported that Plaintiff "had been bragging to an undercover informant that he was abusing the Social Security system" and that he and his wife were fraudulently receiving Social Security disability benefits. The CDIU detective joined the investigation and learned that an undercover officer had purchased prescription drugs from Plaintiff on an unspecified date. Tr. at 196-99.

According to the report, on September 13, 2004, the CDIU detective observed an undercover police officer and a confidential informant, both wearing body microphones,

enter Plaintiff's residence. The CDIU detective heard Plaintiff negotiate over prices and instruct the officer and informant on how to use various drugs. Plaintiff said that he used steroids everyday, and that Medicare paid for them. He said that he had a prescription for OxyContin, of which he keeps 30 pills and sells the remaining 60 pills. Plaintiff also said that he had a prescription for Vicodin and that he traded it for other drugs to sell. Plaintiff said that he worked out at a gym every day. He sold the undercover officer unspecified amounts of Xanax, Anadrol (a testosterone derivative), syringes, and Testosterone Cypionate for a total of $400. The undercover officer asked if she could bring her boyfriend to buy more drugs, and Plaintiff agreed. The CDIU detective observed the undercover officer and the informant exiting Plaintiff's home. Tr. at 199-202.

At a debriefing following the drug buy, the informant, who knew Plaintiff "for some time," said that Plaintiff had told her in the past that he could get the drug Ecstasy if she wanted it. The informant also said that Plaintiff kept half of his drugs in the kitchen and half in his bedroom with his money. The informant stated that Plaintiff had bragged that he was "stealing" from Social Security by telling the administration he was disabled when he was not. The informant also stated that Plaintiff had bragged about a credit card scam "he runs," and that for $1500 he would teach her how to do it. The informant reported that Plaintiff had told her that he worked out at a certain gym for two hours every morning. Tr. at 202.

On September 14 and 17, 2004, the CDIU detective observed Plaintiff working out at the gym, which was about 12 miles from his house. Another controlled buy was

4

conducted on September 23, 2004. The undercover officer, wearing a body microphone, drove to Plaintiff's home and found Plaintiff standing in front of his house. The CDIU detective observed the two enter Plaintiff's house. Plaintiff was heard explaining the effects of the drugs he had, and saying that he rated his drugs from one to ten. Plaintiff also told the undercover officer to bring her boyfriend over to buy steroids. Plaintiff said that if the undercover officer brought her boyfriend, Plaintiff would show the boyfriend a book called "Steroids 101." Plaintiff said he would give the undercover officer a "real good deal" because Plaintiff could use the money. The undercover officer gave Plaintiff $500 in exchange for 60 Xanax pills, 60 Anadrol pills, and 30 Lasix (a diuretic) pills. The pills were in three separate baggies and Plaintiff wrote small notes indicating what pills each baggie contained and the number of milligrams. At a debriefing, the undercover detective confirmed that Plaintiff was "the primary source of the drug sale," with Plaintiff's wife present and instrumental in the sale. Tr. at 203-06.

On September 24 and 27, 2004, the CDIU detective again observed Plaintiff working out at the gym. On September 29, 2004, the CDIU detective learned that Plaintiff was receiving controlled substance prescriptions from two named doctors. On October 4, 2004, the fourth and final undercover purchase was made. The same undercover officer entered Plaintiff's home wearing a body microphone and was heard asking Plaintiff for Xanax. Plaintiff replied that he was glad to sell the officer Xanax because, "we can use the money." Plaintiff was also heard saying, "I got a Fed Ex coming tomorrow with more [drugs]." Plaintiff asked his wife, "How many pills we got back there?" His wife went

into another room and returned with the Xanax, and began counting them. The undercover officer purchased 60 Xanax pills for $100. Tr. at 207-09.

On October 10, 2004, a search warrant for Plaintiff's home was executed with the purpose of seizing illegal drugs, drug money, and any information relating to the purchase and resale of illegal drugs. During the search, a .38 caliber handgun, two pouches of what appeared to be marijuana, a Fed Ex box containing 90 Anadrol pills, numerous other bottles of pills (including anti-depressants, anti-anxiety drugs, and anabolic steroids),[2] $16,900 in United States currency, three boxes of syringes, a book titled "Steroids 101," and photographs from June 2004 of Plaintiff dancing and performing with his band, were found and seized. Tr. at 209-13.

**Reopening of Plaintiff's Case and Evidentiary Hearing of January 11, 2005**

By letter dated November 10, 2004, the ALJ notified Plaintiff that an investigation of his receipt of benefits had been conducted and that the case was referred to the ALJ for consideration of whether Plaintiff was engaged in, or able to engage in, SGA, and whether reopening the decision for fraud or similar fault was warranted. The letter notified

---

[2] The drugs seized were later identified as six bottles of Spironolactone (a diuretic), five bottles of Gabitril (an anti-convulsant), six bottles of Diovan (used to treat hypertension), nine bottles of Anadrol, two bottles of Alprazolam (anti-anxiety medication), one bottle of Lexapro (an anti-depressant), two bottles of Ibuprofen, one bottle of Erythromycin (an antibiotic), one bottle of Furosemide (a diuretic), one bottle of Vitamin D, one bottle of Levothyroxine (a thyroid hormone), one bottle of Cytomel (a thyroid hormone), one bottle of Valtrex (an anti-viral), six bottles of Cyanocobalamin (B12 vitamin), two bottles of ARA Test 2500 (an anabolic steroid), two bottles of Propionat QV 10 (an anabolic steroid), two bottles of Anaboul BD (an anabolic steroid), one bottle of Deca QV300 (an anabolic steroid), two bottles of Miacalcin Nasal Spray, and one tube of Clindamycin Phosphate gel (an antibiotic)

Plaintiff that he had the right to be heard on the matter, and an attachment (absent from the record) informed Plaintiff of the hearing date. In addition, the letter told Plaintiff that he had the right to be represented by an attorney at the hearing, and further stated "considering the possible adverse consequences that could result from a decision, representation by an attorney is strongly advised." Plaintiff was also told that prior to the hearing, he and his attorney had the right to review all of the exhibits that would be relied upon in making a determination, and the right to testify and present witnesses and submit exhibits into evidence at the hearing. Tr. at 231-32.

Plaintiff first testified at the January 11, 2005 hearing that he was represented by counsel Jim Haeffner, but that Mr. Haeffner was undergoing treatment for cancer and would soon be starting six weeks of chemotherapy and radiation. The ALJ confirmed that he had offered Plaintiff, apparently immediately before going on the record, the opportunity to postpone the case so that Plaintiff could hire another lawyer, but that it was Plaintiff's desire not to have another lawyer.[3] Plaintiff testified that he would answer "anything pertaining to [his] disability," but he that he would "plead the fifth" in response to any other questions until his attorney could be present. Plaintiff stated that without an attorney, "I don't know what I'm doing." Tr. at 19-20.

The ALJ proceeded with the hearing and recounted that Plaintiff had been found disabled following a hearing in 2000, that Plaintiff's disability onset date was February 28,

---

[3] In a Memorandum to the Court, filed on April 25, 2006, Plaintiff states that the ALJ had previously continued the hearing. Doc. #13 at 13.

7

1999, and that Plaintiff's disability was major depression recurrent with panic problems. The ALJ further stated that there was currently an "issue" as to whether Plaintiff engaged in SGA after his disability onset date, and that the alleged SGA was the illegal sale of narcotics. Plaintiff asked if that was considered SGA, and the ALJ responded that SGA is "any type of activity that would show that you had the ability to work and make money." Plaintiff stated that it was his understanding that SGA meant a claimant had to work more than 20 hours a week or 80 hours a month and make more than $800 a month. The ALJ said, "I don't think it's all that clear cut." Tr. at 20-21.

The ALJ stated that the present hearing was being held because of the CDIU report, and that because Plaintiff indicated that he was not going to answer questions about the report, they had "nothing to proceed further." Plaintiff then said yes, they did, and proceeded to discuss some of the records. Tr. at 22. Plaintiff stated that he had been admitted to a hospital by his treating psychiatrist, Surendra Giganti, M.D., in 2000. The ALJ asked for copies of reports from Dr. Giganti and from the hospital. Plaintiff stated that he saw Dr. Giganti every month since he had been hospitalized, and that he had monthly reports from those visits. The ALJ admitted those reports into the record. Plaintiff then requested that copies of his entire record be sent to "my workers comp." The ALJ informed Plaintiff that he could come to the Social Security office and make copies of anything he wanted. Tr. at 22-25.

Plaintiff said that he thought he was at the hearing about SGA, and that he had his 2003 tax return with him. He testified that he "reported every bit of musician income that

8

I've ever had when I started the band back in September of '03." He stated that he had updated the Social Security office on his income on a monthly basis up to and including July 2004, when his band "quit on me." Tr. at 25-26.

Plaintiff testified that he had been seeing Dr. Giganti since early 2000 on a monthly basis and that Dr. Giganti had kept him on "a roller coaster of drugs." Plaintiff stated that he was on Lexapro, Trazadone, Halprozolane, and Gabitril, and that he was going to a new psychiatrist. Plaintiff said that he weaned himself off Lexapro because he was getting "too wild, too violent, and stuff like that." He testified that he also stopped taking the Trazadone because, although it helped him sleep, its side effects were anxiety, irritability, anger, and hostility, and that taking it would be "like pouring gasoline on a fire." Plaintiff stated that he had not taken any prescription medication since December 29, presumably of 2004, and that he was currently taking three Tylenols a day. He said, "I'm ruining everybody around me," and, "I have problems." Plaintiff stated that he tried to keep his band together, but that the band members quit because they thought he was crazy. Tr. at 26-27.

Plaintiff testified that "all I got is that lousy . . . $864," presumably referring to his monthly disability benefits. He said that he tried, but never worked for very long at one job. Plaintiff stated "I feel like I need to defend myself, but I don't want to say nothing wrong." Plaintiff asked the ALJ if he was going to make a disability decision on Plaintiff's mental state, or on "what I did wrong" in St. Louis County. The ALJ responded that he was going to take everything in the record into account. Tr. at 27-29.

**ALJ's Decision of January 28, 2005**

The ALJ held that Plaintiff was not disabled as he was engaged in SGA, specifically, the illegal sale of drugs. The ALJ pointed out that a prior benefits decision may be reopened at any time if obtained by fraud or similar fault, citing 20 C.F.R. §404.988 (c), and that he reopened Plaintiff's case after CDIU advised him to do so. Tr. at 13-14.

The ALJ concluded that the sale of illegal drugs can constitute SGA. He cited Corrao v. Shalala, 20 F.3d 954 (9th Cir. 1994), which held that claimant's illegal activities can be both substantial and gainful, and that the amount of activity and the mental or physical exertion involved should be considered to determine whether a claimant performed SGA. The ALJ then found that since Plaintiff chose not to testify regarding his alleged illegal activity, the ALJ's decision had to be founded on the evidence in the record. Tr. at 14.

The ALJ relied on the CDIU report of October 2004 to determine that Plaintiff was engaged in SGA. The ALJ found that although Plaintiff said in his application for benefits that he left his home infrequently and had difficulty being around people, the CDIU investigation revealed that Plaintiff frequently drove 24 miles round-trip to work out at a gym, and was often in crowds when he performed with the band he formed. The ALJ also found that "the evidence of the record is persuasive that the claimant's illegal activity has been of long term since receiving his disability benefits . . . ." The ALJ relied on several

10

statements Plaintiff had made to the confidential informant and undercover officer contained in the CDIU report to find that Plaintiff's illegal business was of an "extensive nature." Plaintiff had told the informant that he could get the drug Ecstasy if the informant wanted it, and told the officer that he rated all of his drugs on a scale of one to ten. Plaintiff also instructed the officer on how to take the pills. Additionally, the ALJ noted that Plaintiff had an extensive inventory of drugs and $16,900 in cash when his home was searched. Tr. at 14-15.

The ALJ concluded that Plaintiff's illegal activity constituted SGA and that "[s]ince the alleged onset date, [Plaintiff] has not been unable to perform substantial gainful activity for any continuous period of 12 months." The ALJ then amended his prior decision so that Plaintiff's December 8, 1999 application for benefits was denied. Tr. at 14-15.

**Plaintiff's Indictment and Plea**

This Court takes judicial notice that Plaintiff and his wife (whose own disability benefits were also terminated due to the drug activity) were indicted in this district on February 24, 2005, on nine counts of criminal activity committed in September and October 2004, including one count of Social Security fraud and eight counts related to the drug activity uncovered in above-described investigation. U.S. v. Marino, No. 4:05CR110 ERW. On June 27, 2005, Plaintiff pled guilty to one count of distribution based upon the September 23, 2004 buy, and to the forfeiture of the $16,900, and the government

11

dismissed the other counts. On September 28, 2005, Plaintiff was sentenced to one month imprisonment.

## DISCUSSION

**Standard of Review and Relevant Statutes and Regulations**

In reviewing the denial of Social Security disability benefits, "the findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive." 42 U.S.C. § 405(g). The substantial evidence test, which is also applicable to the termination of disability benefits, "means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Britton v. Sullivan 908 F.2d 328, 330 (8th Cir. 1990) (citing Richardson v. Perales, 402 U.S. 389, 401 (1971)).

To be entitled to disability benefits, a claimant must demonstrate an inability to engage in any SGA which exists in the national economy, by reason of a medically determinable impairment which has lasted or can be expected to last for not less than 12 months. 42 U.S.C. § 423(d)(1)(A). If a claimant is actually engaged in SGA, he will be found to be not disabled, regardless of his medical condition. 20 C.F.R. § 404.1520(b). SGA is defined in the regulations as activity that is both substantial and gainful. 20 C.F.R.§ 404.1572. Substantial activity is "work activity that involves doing significant physical or mental activities. Your work may be substantial even if it is done on a part time basis . . . ." Id. Gainful activity is work activity done for pay or profit, whether or not a profit is realized. Id.

If a claimant is self-employed, there are additional considerations when determining whether he engaged in SGA. The Commissioner is to consider the claimant's activities and their value to the business. A claimant will be found to have engaged in SGA if his activity is comparable to individuals in the community who are in the same or similar business as a means of livelihood; or income from his activity meets the test in § 404.1574(b)(2);[4] or his activity is significant to the operation of the business and the claimant receives a substantial income from the business. 20 C.F.R. § 404.1575(a)(2)(i).

However, even if a claimant earns less than the presumptive amount, the claimant can still be found to have engaged in SGA. Pickner v. Sullivan, 985 F.2d 401, 403 (8th Cir. 1993) ("Although earnings below the guidelines will 'ordinarily' show that an employee has not engaged in [SGA], earnings below the guidelines will not conclusively show that an employee has not engaged in [SGA]."); Reeder v. Apfel, 214 F.3d 984, 989 (8th Cir. 2000) (upholding district court's determination that plaintiff was engaged in SGA because the work she did involved significant physical or mental activity, even assuming she earned less than the amount suggested by the regulations).

---

[4] Under this regulation, for months before January 2001, the Commission found that a claimant was presumptively engaged in SGA if the claimant's average monthly earnings equaled or surpassed a set amount. In 2000 this amount was $700. Beginning in 2001, a claimant is presumptively engaged in SGA if the claimant's average earnings equal or surpass the larger of (a) the previous year's earnings or (b) an amount calculated using a formula incorporating the national wage index.

13

The legality of the work activity is not relevant. "The work, without regard to legality, that you have done during any period in which you believe you are disabled may show that you are able to work at the [SGA] level." 20 C.F.R. § 404.1571; see also Jones v. Shalala, 21 F.3d 191, 193-94 (7th Cir. 1994) (holding that claimant was engaged in SGA when activity was stealing); Bell v. Comm'r of Soc. Sec., 105 F.3d 244, 247-48 (6th Cir. 1996) (holding that claimant was engaged in SGA when activity was prostitution).

A benefits decision can be reopened at any time if the initial determination was obtained by "fraud or similar fault." 20 C.F.R. § 404.988(c); see also Marshall v. Chater, 75 F.3d 1421, 1426-27 (10th Cir. 1996) (holding that reopening was proper for fraud or similar fault or because there was new and material evidence when claimant was earning more than he reported); Heins v. Shalala, 22 F.3d 157, 162-63 (7th Cir. 1994) (holding that reopening was proper for fraud or similar fault when claimant was a widow receiving her late husband's benefits and did not report that she was remarried); Britton, 908 F.2d at 331-33 (holding that reopening was proper for fraud or similar fault when claimant was operating a profitable business before and after receiving benefits).

**Plaintiff's Mental Disorders**

Plaintiff first argues that he has a disabling impairment and that the ALJ therefore erred in reversing the award of benefits. As stated above, however, Plaintiff's medical condition is not relevant if he was engaged in SGA. 20 C.F.R. § 404.1520(b). In this proceeding, the severity of Plaintiff's mental disorders is not at issue.

**Plaintiff's Right to Representation by Counsel**

Plaintiff's second argument is that he was denied his right to representation by counsel at the January 11, 2005 hearing. A claimant is permitted to be represented by an attorney in proceedings before the Social Security Administration. 20 C.F.R. § 416.1505(a). The Commissioner has the duty to ensure that the claimant is aware of this statutory right to have counsel at a scheduled hearing, but is not required to provide counsel. 42 U.S.C. 406(c). If properly informed of this right, the claimant may waive it. Binion v. Shalala, 13 F.3d 243, 245 (7th Cir. 1994). Plaintiff must be informed not only of his right to counsel, but also of the availability of free legal aid or a contingency arrangement and the limitation of legal fees to 25 percent of past due benefits. Id.

In this case, Plaintiff clearly was aware that he had the right to representation. Prior to his first hearing in 2000, which resulted in the ALJ's determination that Plaintiff was eligible for benefits, Plaintiff received a letter from the Commissioner informing him of his right to a hearing and to be represented at the hearing, including the availability of free counsel and contingency arrangements, and the 25 percent limitation on legal fees. Tr. at 132. Plaintiff, in fact, exercised his right by having an attorney present at the May 30, 2000 hearing. Additionally, the November 10, 2004 letter informed Plaintiff that his case may be reopened, that a hearing was set, and that Plaintiff had the right to be represented by an attorney at the hearing and "considering the possible adverse consequences that

15

could result from a decision, representation by an attorney is strongly advised." Tr. at 231-32.

The record reflects that Plaintiff declined the ALJ's offer for an additional continuance to find another attorney. The Court concludes the ALJ was not obligated to continue the hearing for a minimum of two months, perhaps longer, so that Plaintiff could proceed with the attorney of his choice. The Court finds that under the circumstances of the case, by turning down the ALJ's offer for a continuance to obtain a different lawyer, Plaintiff waived his right to representation at the January 11, 2005 hearing. Additionally, during the hearing, when the ALJ stated that they could not proceed because Plaintiff indicated that he was not going to answer questions about the CDIU report, Plaintiff said that they should proceed. Cf. Carter v. Chater, 73 F.3d 1019, 1021 (10th Cir. 1996) (holding that when claimant was advised prior to the hearing of her right to counsel, she waived it when she proceeded with the hearing without counsel).

Even if Plaintiff did not knowingly waive his right to counsel, he would not be entitled to relief unless he could show that he was prejudiced. Brown v. Shalala, 44 F.3d 931, 934 (11th Cir. 1995). The only prejudice that Plaintiff asserts is that his wife did not believe she would be allowed to have an attorney at her own hearing because Plaintiff did not have one at his hearing. This does not warrant a finding that Plaintiff's rights were violated and that a new hearing is required.

In a somewhat related argument, Plaintiff asserts that he did not receive a full and fair hearing. Although the ALJ always has a duty to develop a full and fair record, when a claimant is unrepresented, the ALJ's duty is heightened so that the ALJ must "scrupulously and conscientiously probe into, inquire of, and explore all the relevant facts." Id. at 934-35 (citation omitted); Binion, 13 F.3d at 245 (holding that although plaintiff did not waive his right to representation, he was not prejudiced because ALJ fully and fairly developed the record). Plaintiff does not contend that the facts contained in the CDIU report on which the ALJ relied are false. Indeed, as noted above, Plaintiff pled guilty to a drug offense arising out of the investigation covered by the report. In a April 25, 2006, Memorandum to the Court, Plaintiff wrote, "I owned up to my 'error in judgment'. . . . I am paying debt to society and 'believe me,' I will never, ever do anything wrong again." Doc. #13, at 2. The Court concludes that Plaintiff received a full and fair hearing before the ALJ.

**Was Plaintiff Engaged in SGA?**

Next, Plaintiff argues that he was not engaged in SGA. The Court finds that there was substantial evidence for the ALJ to find that Plaintiff was engaged in SGA. The record indicates that Plaintiff's drug sale operation was substantial in that it required significant physical or mental activities. Plaintiff was self-employed, and although his wife aided him, the record indicates that Plaintiff was managing the operation. Plaintiff met with clients, made the deals, and handled the monetary transactions. He actively

17

attempted to gain new business, as demonstrated when he told the undercover officer to bring her boyfriend over and said he had a steroids book that he would show him. Tr. at 205. Plaintiff also kept the supplies he needed to sell prescription drugs, including the drugs themselves, syringes, and plastic baggies.

The record also indicates that Plaintiff's activity was gainful because it was clear he was engaged in it for a profit motive, and did make a profit. Plaintiff was found to have $16,900 in cash in his home. Additionally, he was twice heard telling the undercover officer that he was happy the officer was buying drugs because he could "use the money." Tr. at 205, 208. Just with the purchases of the undercover officer, Plaintiff earned a total of $1000 in less than one month. Tr. at 210, 205, 208. And he stated that he had another Fed Ex package of drugs scheduled to arrive. Tr. at 208.

The Court, however, finds no substantial evidence in the record as a whole supporting the finding that Plaintiff was engaged in SGA as of his disability onset date of February 28, 1999, or within 12 months of that date. As noted above, the ALJ stated that "the evidence of the record is persuasive that the claimant's illegal activity has been of long term since receiving his disability benefits," and concluded that Plaintiff had not been unable to perform substantial gainful activity from February 28, 1999, and thereafter, for any continuous period of 12 months. The ALJ does not indicate on what evidence he relies to support this conclusion. The Commissioner's brief in support of the answer posits that the ALJ's conclusion is supported by the confidential informant's statements

that Plaintiff bragged that he received disability benefits although he was not disabled, and that Plaintiff had offered to teach her a credit card scam in return for $1500. These statements, even if taken as true, do not constitute substantial evidence of the duration of Plaintiff's SGA.

The Commissioner also points to the evidence in the record that Plaintiff worked out daily and was photographed dancing while performing with his band. The photographs in question were taken in June 2004, and the only evidence in the record as to when the band was formed is Plaintiff's statement that it was formed in September 2003. In any event, this evidence is not related to Plaintiff's engagement in SGA. The amount of drugs and money found in Plaintiff's apartment, as well as statements by the informant related to a time period before September 2004, certainly indicate that Plaintiff's drug-selling operation began before September 2004. But the Court does not see evidence in the record to support the ALJ's conclusion that Plaintiff was engaged in SGA as far back as 12 months within his onset date.

The Court concludes that the case must be remanded for the Commissioner to determine when Plaintiff first engaged in SGA. The record may contain evidence that would support a decision that Plaintiff fraudulently misrepresented facts in connection with his December 1999 application for disability benefits, and that he was not disabled at that time. See Britton, 908 F.2d at 331-32 (evidence that recipient of disability benefits intended to defraud government at time of applying for benefits by continuing SGA after

benefits began could include conduct of recipient after year in which claim was made). The Court believes, however, that this decision must be made in the first instance by the Commissioner and not the Court. Here the ALJ limited his decision to finding that Plaintiff was engaged in SGA.

## **CONCLUSION**

**IT IS HEREBY ORDERED** that the decision of the Commissioner is **AFFIRMED** in part and **REVERSED** in part. The decision is affirmed with respect to the denial of benefits from August 2004. The decision is reversed with respect to the denial of benefits prior to that date, and **REMANDED** for further consideration consistent with this Memorandum and Order.

An appropriate Judgment shall accompany this Memorandum and Order.

_____
AUDREY G. FLEISSIG
UNITED STATES MAGISTRATE JUDGE

Dated on this 16th day of January, 2007.